23-706 and 23-7112 United States v. Sullivan and not Ms. Shapiro. Good morning and may it please the court. My name is Alexandra Shapiro and I represent Appellant Donal O'Sullivan. It's undisputed that there's no flight risk or danger here so the only issue before the court is whether the appeal presents substantial questions that if resolved in Appellant's favor would result in reversal or a new trial and we have presented at least two. I'd like to turn first to the sufficiency of Sienta issue. At a minimum this was a very close case and the merits panel will have to carefully scrutinize the record to assess sufficiency. To prove Sienta on all of the counts the government had to prove that Mr. O'Sullivan knew both what the collective bargaining agreements at issue said was covered work and what the workers that allied paid were actually doing. Yet it induced no direct evidence of his knowledge of either fact. At best for the government the circumstantial evidence only cut both ways which establishes reasonable doubt as a matter of law. Mr. O'Sullivan was the president of a very large construction company with thousands of workers. Neither he nor his company even negotiated the collective bargaining agreements at issue. They were extremely complex and arcane as to what was covered. Counsel, counsel, how is this case, can you hear me? Yes, I can. How is this case different in terms of sufficiency of the evidence from all the sufficiency of the evidence cases we have where we may have a great deal of doubt but practically in this circuit never reverse a jury verdict? Well, Your Honor, I think never is rather extreme and there are a number of cases in which this court has reversed on sufficiency grounds. Particularly where the cases involved purely circumstantial evidence of intent including a number cited in our papers such as the Copeland case, the Valley case, the Glenn case. You conceded in your opening remarks that there are inferences available from which the jury could have concluded scienter, right? We disagree with that, Your Honor. I thought you said the inferences could go both ways and that's reasonable doubt which is a perfectly good jury argument. No, Your Honor. With all due respect, the cases that I just named specifically hold that where inferences can go either way and are at best in equipoise, then as a matter of law, there is reasonable doubt and reversal is required. Indeed, Judge Calabresi was on the panel, I believe, in the Cassessi case which is another one where there was a reversal. I believe Judge Kearse was on the panel in one of those cases that I just mentioned, I think the Pauling case. And so this court does do that. This case is a classic example of that type of situation. Moreover, we're here on bail and all we have to show is that the matter is at least debatable or close and if so, bail is required in this context. And the merits panel will carefully scrutinize the record and assess the merits, but that's not what we're here for today. If I can, I don't have much time. I'll just briefly mention our second issue, the 404B issue. Again, we believe that satisfies the debatable or close question standard. The district judge's own change of mind on the issue itself shows. Well, change of mind in light of the argument that the defense made and put on regarding the volume of funds, the quantity of funds that went to for pension benefits, right? It wasn't just, oh, I changed my mind. It was, okay, now intent is an issue. Do I have that right? That is what the district court stated about why she allowed the evidence in. However, she also conceded that she had made a factual error and at trial transcript page 1058, admitted that she had made an incorrect assumption that there wasn't a serious dispute about the alter ego allegations in the civil case from which this evidence emerged. And our primary legal argument here is that there was no foundation and that there were a number of factual points that had to be established by this evidence for it even to be relevant, one of which was whether these companies were, in fact, alter egos. And the district judge conceded that she hadn't realized the progress. Just a moment. Just a moment. I want to make sure we have Judge Calabresi. Judge Calabresi, can you still hear us? I'm back. I'm sorry. I don't know what happened. Okay. Go ahead. I see my time is up. I'll just lastly point out that if the court agrees there's a substantial question we submit, there's no reason not to stay the restitution Mr. O'Sullivan has offered to either post a bond or put the money in the court's registry during the pendency of the appeal. Thank you, counsel. Thank you. Mr. Marmor. Good morning, Your Honors. And may it please the court, my name is Nathaniel Marmor and I represent appellant move-in Padraig Naughton. Again, as with Mr. O'Sullivan, it's undisputed that Mr. Naughton does not present a flight risk nor a danger to the community. And therefore, the question is whether we have posed a substantial issue of law that may warrant reversal or vacating of the conviction. And here we have made that showing for purposes of bail. Certainly, there is a substantial question of whether the evidence, which is circumstantial, could easily be resolved in Mr. Naughton's favor. Now, Mr. Naughton was a salaried employee of Nuvillus. He had no ownership interest in the company. He had no, quote, skin in the game with respect to this alleged scheme. He had no idea whether employees were engaged in covered work, if in fact they were engaged in covered work. And that is sort of the bare bones factual question is, what were these employees doing, whether that was covered, before one even gets to the question of whether Mr. Naughton knew about it. And the evidence, the government's evidence on that was quite thin, what they were doing. The examples they gave in their brief and their motion papers showed that at least maybe some of the employees at some time over a seven-year period, that some 154 out of 5,000 employees may engage in some work that may have tangentially touched upon some definition in a CBA that could be considered covered. That's not even clear that they did that. The CBAs themselves are very hard to interpret. The question of whether that work was covered was very, very difficult to understand. These are complex instruments with many different clauses, conflicting debates among the unions. I could give some examples of the language that they use, which borders on indecipherable. But rather than getting bogged down by that, it's important to know that Mr. Naughton in no way had any idea what these CBAs were, what the employees, the terms of the CBA, I should say. He was not involved in negotiating them, interpreting them. He had no involvement with them whatsoever. He did not know what acts the employees, what work they were performing, and he certainly had no idea whether they fell within the scope of any of the CBAs. And just if I can, maybe it's a slight detour to point out that of the seven unions involved here, three of them, there was no CBA that was even introduced into evidence, making the question of whether there was covered work at all virtually impossible for the jury to comprehend. It really was impossible. They have no idea how to even apply an unknown document to the work that was at issue. So from Mr. Naughton's perspective, he simply had no idea whether any work was engaged by these employees. And even so, and I think we don't even need to get that far, the court doesn't need to get that far in evaluating the sufficiency, he certainly had no criminal intent to defraud anyone out of union benefits. Again, we're talking about a minuscule number of employees on Allied's payroll. At any time, there may have been a handful, some work a day, a week, a month. We're talking about a very small amount compared to the, I think I said 5,000 or so employees. There was essentially, from Mr. Naughton's perspective, he understood that he was to help Karen Lamb, whatever Lamb's purpose was in doing this, to set up what they understood to be, Lamb described as a non-union payroll. And he did some basic, helped some basic efforts at the outset to do that, such as helping him get insurance and helping him set up an arrangement with ADP. But other than that, that doesn't even show any criminal intent. But there's nothing at all in the record to show that Mr. Naughton intended to deceive these union benefit funds of even a penny. And again, as Ms. Shapiro said, at this point, we're here on bail. We believe that there's more than a substantial question of whether the evidence that a merits panel will consider when they really dig deep into this record, we'll see that this is a circumstantial case, that the evidence at best, the inferences are at best in equipoise between inferences of guilt and innocence. And if that occurs, then the merits panel should reverse the case. And at this point, we argue that bail should be granted for those reasons. All right. Thank you, counsel. From the government, Mr. Buford. Good morning, your honors. May it please the court. My name is Turner Buford and I represent the United States in this appeal as well as in the proceedings before the district court. Your honors, just to pick up where counsel left off with respect to the evidence for Mr. Naughton, the jury was presented with ample evidence to conclude that he had the criminal center to commit this crime. As counsel pointed out, Mr. Naughton was the controller, the accountant at Navalis, who ordinarily wouldn't have had responsibility for payroll administration. And yet from the beginning, he was the one who initiated the infrastructure to create this fraudulent payroll. He went to Mr. Lamb after he was referred to Mr. Lamb by Mr. O'Sullivan. He came up with the name, the doing business as name that Mr. Lamb was not previously using, Allied. He set Allied up with an ADP account. He provided or made sure that Allied had insurance for the employees that were going to be paid through this alternative payroll. And then he personally transmitted the first weekly payroll sheet that showed the workers that were going to get paid through this fraudulent arrangement. That payroll sheet and others that he personally sent, despite not having any payroll responsibility, facially identified the workers as performing trades that are covered by the collective bargaining agreements. Bricklayer, carpenter. It was clear from the face of the sheets that he himself was transmitting. And then most significantly, when the union benefits funds conducted audits of Navalis' business, Mr. Naughton was the point of contact for those audits. He well understood that those audits required Navalis to provide its entire payroll, not just the payroll for union members, its entire payroll, and he deliberately and consistently withheld the Allied payroll from the union auditors for years. Audit after audit, year after year. He was also responsible for making sure that the invoices that Allied sent to cover the costs of this payroll did not accurately reflect the payroll processing services that were being provided. Mr. Lamb wanted to use the term masonry in the invoices because that helped him with his visa fraud. Mr. Naughton said, don't say masonry. Either leave it blank or say consulting. And the reason he did that is because part of the audit process is the unions can look at the expenses that Navalis has and just try to see if they're using any outside payroll services. And if they saw these invoices, they wouldn't see paymaster, payroll processing. They would see consulting and not ask any follow-up questions. So the evidence against Mr. Naughton was more than sufficient to sustain his conviction. Even if he wasn't at a particular job site, he had reason to believe that these workers were performing covered work. You don't need to be in the weeds of the collective bargaining agreements to know that the bricklayers union might be interested in the payroll for an employee who's labeled as a bricklayer in the payroll sheets that Navalis creates. And yet he did not provide those payroll sheets to the unions as part of the audit process. And the evidence also shows that he was told or instructed to do this by Mr. O'Sullivan, his boss, turning to the sufficiency with respect to the evidence against him. Mr. O'Sullivan had the initial meeting with Mr. Lamb where he realized that Mr. Lamb was desperate for work. He said we're going to try to work something out. Almost immediately thereafter, Mr. Naughton enters. Mr. O'Sullivan referred Mr. Lamb to Mr. Naughton. And they begin the process of setting up this alternative payroll system. Mr. O'Sullivan is himself a member of the bricklayers union. The evidence with trial showed that he personally signed one of the collective bargaining agreements. And more taking a step back, Navalis is a union shop. The CBAs and their relationship with unions are a big part of their business. So the idea that Mr. O'Sullivan wasn't familiar with the terms of the collective bargaining agreements is inconsistent with the evidence. And then Mr. O'Sullivan confirms his knowledge of this arrangement in his own words in an e-mail a few months after the arrangement is up and going, calling it the weekly arrangement in an e-mail to Mr. Lamb. Meaning he's well aware that this payroll process is being run. And it's important to note that this particular payroll processing is outside of Navalis' ordinary payroll processing because the company has its own in-house payroll department, meaning it was wildly inefficient for Navalis to set up this system this way unless they were reaping savings, those savings being the avoided contributions that they didn't have to make. And the jury also heard evidence that Mr. O'Sullivan was familiar with at least one of the workers that was getting compensated through this, Mr. Gonzales, who had his payroll information personally mailed to Mr. O'Sullivan's house in the name of Mr. O'Sullivan's brother-in-law. And that Mr. Gonzales had discussions with Mr. O'Sullivan about joining a union because he was doing the kind of work that was covered or done by union employees. So Mr. O'Sullivan had personal knowledge of at least one of the workers on these sheets. And Mr. O'Sullivan's also funding this payroll, personally writing the checks that go to cover it. And it's worth noting that that itself is an unusual arrangement because he's not just writing a check for a processing fee for Allied to do data entry. He's transferring the funds not just to pay a processing fee but to cover the entire payroll. So the money leaves Nablus's bank account, goes to Allied's bank account, and is then used to issue paychecks in the name of Allied rather than Nablus. And Mr. Lamb and his assistant at trial testified that's different from how an ordinary paymaster relationship would work, which is you would pay somebody a processing fee to do data entry, and the checks would issue in the name of the client construction company, drawn on the bank account of the client construction company. This is, again, wildly inefficient. And the jury was free to conclude the reason for it was because it was in furtherance of fraud. With respect to the evidentiary ruling made by the district court, the government tried pretrial to preclude what we viewed as essentially reverse 404B evidence, the evidence that Nablus had made $145 million in contributions to the unions for its legitimate payroll. We thought that was good propensity evidence that shouldn't come in. But if it were to come in, we viewed that as opening the door to evidence that Nablus didn't always and everywhere square its books with the unions and that it did use some of these other companies to compensate some of these very same employees. The district court didn't allow us to put in the full extent of the evidence that we wanted to. It instead allowed us to put in a very narrow subset of the evidence. What did you understand the purpose of the defense evidence to be? I think the purpose was to, as articulated by the defense, the argument was the jury needs to understand that there's a lack of motive here because we contributed, or Nablus contributed, $145 million to these victim unions over the course of the alleged scheme. The government's evidence is at best the scheme resulted in the savings to Nablus of approximately $4 million. Why would these defendants have risked criminal liability for so paltry a savings? As the district court allowed us to put in only a limited rebuttal evidence, I think the testimony of Special Agent Bonetto that's appended to the defense briefs is that that maybe added another $900,000, maybe, in avoided contributions, meaning it did not materially dilute the effect of the argument the defense wanted to make, which was instead of $145 million to $4 million, it's now $145 million to maybe $4,900,000. The full force of the lack of motive argument went to the jury and was considered as part of the evidence. And so from our perspective, it can't credibly be argued that had this other company evidence been excluded, that the jury would have come out the other way. The limited rebuttal just wasn't effective in terms of blunting that argument as articulated by the defense. And I don't think that the judge was operating under a factual— Doesn't that diminish the relevance when weighed against the prejudice? I think that the—well, I don't know that it—I don't think so, Your Honor, because I think it is a small amount of prejudice to the defense from this extra evidence, but they also get the benefit by virtue of the court's ruling of getting in the core of their argument, which is the $145 million which they wanted to present and we tried to preclude. I think the district court is like, that opens the door to this other evidence in some form. And I don't think the district court was operating under a factual misconception when it made that pretrial ruling. I think what the defense is citing to happen at the end of the first trial day, when the district court was presented an opening statement with the $145 million contribution summary chart, which I don't think the court had appreciated, was—had been foregrounded, was going to be foregrounded by the defense as much as it was, and the district court contemplated that evening allowing the government to put in more than it had previously permitted the government to put in because she viewed the opening statements as unfair to the government, just how much that $145 million was being emphasized in light of the other evidence. So when the defense pointed out to the judge, reminded the judge, that the relationship between Nablus and these other companies was in dispute, the judge adhered to the original ruling and decided not to allow the government to put in even more than was originally contemplated. We view that as discretionary or within the court's discretion, and even if this court were to conclude that the balance should have been struck slightly differently, we view it as harmless error and not the stuff of a substantial question. All right. Thank you, counsel. The motion is submitted. We'll reserve decision.